**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| v. | : | |
| TEDIKEYA MCFADDEN | : | No. 15-376-4 |

**MEMORANDUM**

PRATTER, J.                                                                                                               JANUARY 6, 2021

Defendant Tedikeya McFadden seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The primary basis for her motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may affect Ms. McFadden. The Government opposes Ms. McFadden's motion. For the following reasons, the Court denies the motion.

**BACKGROUND**

**I.    Ms. McFadden's Criminal Conduct**

Ms. McFadden assisted in the operation of a large-scale drug trafficking organization for over five years, bringing in large quantities of cocaine and marijuana to the Philadelphia area. (Doc. No. 738 at 1.) In May 2016, Ms. McFadden was charged in a superseding indictment with conspiracy to distribute five kilograms or more of cocaine and 1000 kilograms of marijuana, in violation of 21 U.S.C. § 846 (Count 1); distribution of marijuana, in violation of 21 U.S.C. §§ 846, 841(a), (b)(1)(D), and aiding and abetting in violation of 18 U.S.C. § 2 (Count 9); possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and aiding and abetting, in violation of 18 U.S.C. § 2 (Count 11); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 12). (Doc. No. 176.)

In March 2017, pursuant to a written plea agreement, Ms. McFadden pled guilty to the above counts. (Doc. No. 333.) During an October 2018 sentencing hearing, the Court found that Ms. McFadden was subject to an advisory sentencing guideline range of 188 months to 235 months, given her criminal history and total offense level. The parties jointly recommended a sentence within that range. (Doc. No. 738 at 4.) The Court then imposed a 188-month sentence. (Doc. No. 563.) Ms. McFadden is currently serving her sentence at FCI Danbury, with an anticipated release date of February 2029. She has served approximately 62 months and has credit for good conduct time of 7 months, for a total time credit of approximately 69 months. (Doc. No. 738 at 5-6.) Ms. McFadden had disciplinary infractions in 2019 for refusing an order and being insolent, and in 2018 for misusing authorized medication. (Doc. No. 738 at 6.)

## II. Ms. McFadden's Request for Compassionate Release

On May 22, 2020, Ms. McFadden submitted a request for compassionate release to her facility's warden. Her request was based on three medical conditions: G6PD (glucose-6-phosphate dehydrogenase deficiency), hypothyroidism, and kidney malfunction. The warden denied her request on June 1, 2020, finding that Ms. McFadden had not been diagnosed with kidney malfunction, and that her other two conditions, G6PD and hypothyroidism, did not place her at high risk of severe illness from COVID-19. (Doc. No. 738 at 6.) Ms. McFadden's motion for compassionate release, which was docketed on August 25, 2020 but is dated July 3, 2020, lists the same three conditions and also iron deficiency. (Doc. No. 735.) Ms. McFadden filed a subsequent motion for compassionate release in December 2020, which contains her original motion and several exhibits; one new issue raised by Ms. McFadden is that the situation at FCI Danbury and her body mass index warrant her release to home confinement.[1] (Doc. No. 775 at 4.)

---

[1] To the extent Ms. McFadden seeks release to home confinement, the Court notes that "Congress did not provide the courts with the authority to release inmates into home confinement" as "[t]his discretion

2

Ms. McFadden's medical records show that she is 42 years old and has been diagnosed with G6PD, iron deficiency, and hypothyroidism. (Doc. No. 738 at 6.) These conditions appear to be well-controlled with medication, and Ms. McFadden is able to engage in all normal activities of daily living within the prison. (Doc. No. 738 at 6.) Ms. McFadden's BOP medical records do not support her claim of kidney malfunction, given that the most recent lab results were within the normal range. (Doc. No. 738 at 6-7.) Lastly, Ms. McFadden now claims that her body mass index (BMI) puts her at an increased risk for severe illness from COVID-19. However, Ms. McFadden presents no recent measurements showing what her BMI is. A review of her medical records shows that in August 2020, she measured 5 feet, 6 inches tall and weighed 171 pounds, which amounts to a BMI of 27.6. (Doc. No. 739 at 45, 148.) A BMI in this range is considered overweight but not obese.

### III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[2] and it has taken significant measures to protect the health of the inmates in its charge. BOP has had a Pandemic Influenza Plan in place since 2012.[3] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it

---

rests solely with the Attorney General and the BOP Director." *United States v. Pettiway*, No. 08-cr-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020).

[2] BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Jan. 6, 2021).

[3] BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Jan. 6, 2021).

established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved. Social visits remain suspended or severely curtailed.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[4] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for

---

[4] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

BOP's efforts at combating the effects of the pandemic have extended to FCI Danbury, especially given an earlier outbreak that the facility experienced. *United States v. Ackerman*, No. 11-cr-740-KSM-1, 2020 WL 5017618, at *7 (E.D. Pa. Aug. 25, 2020) ("[A]s courts have recognized, the number of inmates and staff inflicted with COVID-19 at FCI Danbury has improved drastically over the past several months, suggesting that the mitigation efforts the BOP introduced and implemented have been successful."). FCI Danbury currently houses 824 inmates. As of January 6, 2021, there are currently 17 COVID-positive inmates and one COVID-positive staff member.[5] Since 2020, 179 inmates and 75 staff members have recovered from COVID-19 at FCI Danbury. One FCI Danbury inmate has died.

### LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18

---

[5] The data is current as of January 6, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

5

U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[6] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . .

---

[6] "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[7] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

### DISCUSSION

The Court certainly does not minimize the critical health risk posed by COVID-19. But as very concerning as the current pandemic is, resolving Ms. McFadden's motion still requires the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Ms. McFadden argues that she should be released, given her BMI and other medical issues. Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness

or death.[8] "While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

But for COVID-19, Ms. McFadden would likely present no basis at all for compassionate release. In light of the COVID-19 pandemic, Ms. McFadden asserts that she is more susceptible to complications from COVID-19. (Doc. No. 735 at 1.) However, her purported medical issues do not necessarily, actually or theoretically, warrant the emergency relief Ms. McFadden requests. Ms. McFadden asserts that she suffers from kidney malfunction, a condition that is a CDC risk factor in relation to COVID-19. The Government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 n.1. The CDC has recently revised its list of people with certain medical conditions who "are at increased risk of severe illness" from COVID-19.[9] The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. The CDC considers chronic kidney disease to be an underlying medical condition that puts an individual at an increased risk of severe illness from COVID-19. While Ms. McFadden points to her alleged "kidney malfunction," nothing in her BOP medical records show that she has chronic kidney disease or that she has a diagnosis of kidney malfunction.

---

[8] *See People at Increased Risk*, Centers for Disease Control and Prevention (Jan. 4, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Jan. 6, 2021).

[9] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 29, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

Conversely, BOP medical records do show that Ms. McFadden has been diagnosed with the other conditions she describes in her motion, including iron deficiency, hypothyroidism, and G6PD, which is an enzyme deficiency. However, none of these conditions have been identified as high-risk factors for COVID-19. G6PD has not been identified by the CDC as a factor that might increase the risk of complications from COVID-19. *United States v. Davis*, No. 12-cr-712 (SHS), 2020 WL 4573029, at *1 (S.D.N.Y. Aug. 7, 2020) ("[A] G6PD-related affliction does not appear on the Centers for Disease Control and Prevention's list of high-risk conditions"). Similarly, the CDC does not list hypothyroidism or iron deficiency as high-risk factors for severe illness from COVID-19. *See United States v. Fleck*, No. 1:15-cr-00300-DAD-BAM, 2020 WL 6875579, at *6 (E.D. Cal. Nov. 23, 2020) ("[T]he the CDC does not recognize hypothyroidism as a health condition that places one at an increased risk of suffering severe illness from COVID-19"); *United States v. Cooper*, No. 16-cr-567-3 (JSR), 2020 WL 4937477, at *1 (S.D.N.Y. Aug. 24, 2020) (noting that iron deficiency is not one of the high-risk conditions identified by the CDC). Furthermore, these conditions are being monitored and treated with medication, including vitamin supplements. Ms. McFadden does not argue otherwise in her motion.

In her most recent compassionate release motion, Ms. McFadden states that she should be released to home confinement because of her BMI. (Doc. No. 775 at 4.) However, Ms. McFadden does not state what her current BMI is. Turning to her BOP medical records, it appears that as of August 2020, based on her height and weight, as mentioned above, Ms. McFadden had a BMI of 27.6. The CDC identifies obesity, or those with a BMI of 30 or greater, as presenting an increased risk.[10] However, Ms. McFadden is not at that threshold. The CDC notes that overweight individuals, or those with a BMI between 25 and 30, "might be at an increased risk" for

---

[10] *Id.*

9

complications from COVID-19 but there is limited data and information. As described in the above guidelines policy statement, a qualifying medical condition is only one in which the inmate is "not expected to recover." Here, not only Ms. McFadden not in the high-risk category, she conceivably could move out of the lower threshold category by lowering her BMI under 25. In general, courts have been reluctant to grant compassionate release based solely on obesity. Ms. McFadden is below this threshold, inasmuch as she is only considered overweight based on her BMI. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[O]besity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."); *United States v. Peralta*, No. 19-cr-135 (VEC), 2020 WL 6683095, at *2 (S.D.N.Y. Nov. 12, 2020) (noting defendant could not "establish extraordinary and compelling reasons justifying compassionate release based solely on being overweight").

It appears that any conditions Ms. McFadden currently has are being well-controlled with medication and she does not have any impediment to her ability to care for herself at the institution. For the foregoing reasons, Ms. McFadden's stated medical conditions do not present an extraordinary and compelling reason for her compassionate release.

As to the current situation at FCI Danbury, the Court in no way minimizes the threat that COVID-19 poses. While there was an outbreak at FCI Danbury earlier in 2020, currently, as mentioned above, as of January 6, 2021, FCI Danbury reports 17 inmates and one staff member are COVID-positive, and 179 inmates and 75 staff members have recovered.[11] While the COVID-19 pandemic is a fluid and serious situation, the Court sees that FCI Danbury is engaged in strenuous efforts to protect inmates and staff members against further spread of COVID-19. The

---

[11] The data is current as of January 6, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

BOP website continues to provide transparent information with the community about positive cases and recoveries.

Even if Ms. McFadden had presented an extraordinary and compelling reason that warranted her compassionate release, the Court's consideration of the § 3553(a) factors necessitate a denial of Ms. McFadden's motion. Ms. McFadden has failed to show how releasing her before she serves the full term (or a much more significant portion) of her sentence would align with the statutory sentencing factors, notably the seriousness of her offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a).

Ms. McFadden was a key participant in a significant drug trafficking organization, and prior to that had served time for other federal drug offenses. While the Court commends Ms. McFadden for the opportunities she has utilized to "better [her]self and prepare for [her] eventual return to the community," at this time, the conclusion is inescapable that she still continues to present a danger to the community. (Doc. No. 735 at 2.) Ms. McFadden's criminal conduct involved a conspiracy to distribute cocaine and marijuana as well as money laundering. Even if Ms. McFadden did have underlying high-risk medical conditions, her crimes were serious, and an early release would not provide just punishment or serve as a deterrent to others. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

Lastly, Ms. McFadden has not yet served a significant portion of her sentence. Accounting for good conduct time, she has served approximately 69 months, or just over one third, of her 188-month sentence. An early release would be contrary to the § 3553(a) factors. *See United States v.*

*Torres*, No. 18-cr-414, 2020 WL 3498156, at *10 (E.D. Pa. June 29, 2020) (denying compassionate release for 36-year-old inmate with mild asthma due to seriousness of his crime and having served 15% of 63-month sentence); *United States v. Shulick*, No. 16-cr-428, 2020 WL 3250584, at *5 (E.D. Pa. June 16, 2020) (denying compassionate release where defendant had served 19 months of a 60-month sentence for embezzlement, fraud, and filing false tax returns).

## CONCLUSION

For the foregoing reasons, the Court denies Ms. McFadden's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE